# IN THE UNITED STATES DISTRICT COURT
# FOR THE MIDDLE DISTRICT OF TENNESSEE
# NASHVILLE DIVISION

| | |
|---|---|
| ANTHONY STANTON, | ) |
| Plaintiff, | ) |
| v. | ) NO. 3:18-cv-00378 |
| CORRECT CARE SOLUTIONS, et al., | ) JUDGE CAMPBELL |
| Defendants. | ) |

## MEMORANDUM AND ORDER

Plaintiff Anthony Stanton, an inmate at the Northwest Correctional Complex in Tiptonville, Tennessee, has filed a pro se complaint under 42 U.S.C. § 1983 and an application to proceed in forma pauperis (IFP). (Doc. Nos. 1, 2.) On May 23, 2018, the Court entered an order finding Plaintiff's IFP application deficient, and directing Plaintiff to file a proper IFP application within thirty days. (Doc. No. 5.) On June 4, 2018, Plaintiff filed a new IFP application (Doc. No. 7) supported by a proper certification of his current inmate trust fund account balance and statement of account for the preceding six months (Doc. No. 8).

## I. Application to Proceed IFP

Because it is apparent from Plaintiff's submission that he lacks the funds to pay the entire filing fee in advance, his application to proceed IFP (Doc. No. 7) is **GRANTED**. Pursuant to 28 U.S.C. §§ 1915(b) and 1914(a), Plaintiff is nonetheless assessed the $350.00 civil filing fee. The warden of the facility in which Plaintiff is currently housed, as custodian of Plaintiff's trust account, is **DIRECTED** to submit to the Clerk of Court, as an initial payment, the greater of: (a) 20% of the average monthly deposits to Plaintiff's credit at the jail; or (b) 20% of the average monthly balance to Plaintiff's credit for the six-month period immediately preceding the filing of

the complaint. 28 U.S.C. § 1915(b)(1). Thereafter, the custodian shall submit 20% of Plaintiff's preceding monthly income (or income credited to Plaintiff for the preceding month), but only when the balance in his account exceeds $10.00. 28 U.S.C. § 1915(b)(2). Payments shall continue until the $350.00 filing fee has been paid in full to the Clerk of Court. 28 U.S.C. § 1915(b)(3).

The Clerk of Court **MUST** send a copy of this Order to the Warden of the Northwest Correctional Complex to ensure compliance with that portion of 28 U.S.C. § 1915 pertaining to the payment of the filing fee. If Plaintiff is transferred from his present place of confinement, the custodian must ensure that a copy of this Order follows Plaintiff to his new place of confinement, for continued compliance with the Order. All payments made pursuant to this Order must be submitted to the Clerk of Court for the United States District Court for the Middle District of Tennessee, 801 Broadway, Nashville, TN 37203.

## II. Initial Review of the Complaint

### A. Motions to Amend and to Appoint Counsel

As a preliminary matter, Plaintiff has filed a Motion to Amend Plaintiff's Verified 42 U.S.C. § 1983 Civil Rights Complaint (Doc. No. 4), for the sole purpose of correcting a clerical error in his original complaint, which omitted his request for damages against five previously named Defendants. Plaintiff's Motion to Amend is **GRANTED**.

Plaintiff has also filed an Affidavit of Need (Doc. No. 6), in which he seeks the appointment of counsel to represent him in this matter. The Court construes this filing as a Motion to Appoint Counsel. "The appointment of counsel in a civil proceeding is not a constitutional right and is justified only in exceptional circumstances." *Bush v. Dickerson*, No. 16-6140, 2017 WL 3122012, at *4 (6th Cir. May 3, 2017) (quoting *Lanier v. Bryant*, 332 F.3d 999, 1006 (6th Cir. 2003)). Plaintiff's circumstances are not atypical of those giving rise to much of the pro se prisoner

2

litigation in this Court, and his complaint demonstrates that he is capable of presenting his case at this point. Accordingly, Plaintiff's Motion to Appoint Counsel (Doc. No. 6) is **DENIED** without prejudice to refile if changed circumstances warrant revisiting the issue in the future.

### B. PLRA Screening Standard

Pursuant to 28 U.S.C. § 1915(e)(2)(B), the Court must dismiss any IFP complaint that is facially frivolous or malicious, fails to state a claim upon which relief may be granted, or seeks monetary relief against a defendant who is immune from such relief. Similarly, Section 1915A provides that the Court shall conduct an initial review of any prisoner complaint against a governmental entity, officer, or employee, and shall dismiss the complaint or any portion thereof if the defects listed in Section 1915(e)(2)(B) are identified. Under both statutes, this initial review of whether the complaint states a claim upon which relief may be granted asks whether it contains "sufficient factual matter, accepted as true, to state a claim to relief that is plausible on its face," such that it would survive a motion to dismiss under Federal Rule of Civil Procedure 12(b)(6). *Hill v. Lappin*, 630 F.3d 468, 470–71 (6th Cir. 2010) (quoting *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009)). "A claim has facial plausibility when the plaintiff pleads factual content that allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged." *Iqbal*, 556 U.S. at 678. Applying this standard, the Court must view the complaint in the light most favorable to Plaintiff and, again, must take all well-pleaded factual allegations as true. *Tackett v. M & G Polymers, USA, LLC*, 561 F.3d 478, 488 (6th Cir. 2009) (citing *Gunasekera v. Irwin*, 551 F.3d 461, 466 (6th Cir. 2009) (citations omitted)). Furthermore, pro se pleadings must be liberally construed and "held to less stringent standards than formal pleadings drafted by lawyers." *Erickson v. Pardus*, 551 U.S. 89, 94 (2007) (quoting *Estelle v. Gamble*, 429 U.S. 97, 106 (1976)).

## C. Section 1983 Standard

Plaintiff seeks to vindicate alleged violations of his federal constitutional rights under 42 U.S.C. § 1983. Section 1983 creates a cause of action against any person who, acting under color of state law, deprives an individual of any right, privilege or immunity secured by the Constitution or federal laws. *Wurzelbacher v. Jones-Kelley*, 675 F.3d 580, 583 (6th Cir. 2012). Thus, to state a Section 1983 claim, Plaintiff must allege two elements: (1) a deprivation of rights secured by the Constitution or laws of the United States, and (2) that the deprivation was caused by a person acting under color of state law. *Carl v. Muskegon Cty.*, 763 F.3d 592, 595 (6th Cir. 2014).

## D. Allegations of the Complaint

Plaintiff sues two officers of the Davidson County Sheriff's Office (DCSO) and nine medical providers staffed by Correct Care Solutions (CCS) at the DCSO, as well as CCS itself, for violations of his Eighth and Fourteenth Amendment rights related to the medical care he received while incarcerated there. (Doc. No. 1 at 1–2; Doc. No. 4 at 1.)

Plaintiff alleges that in April 2017, while housed at the DCSO in Nashville, Tennessee, he noticed a small, hard spot on the bottom of his right foot and filed a sick call request. (Doc. No. 1 at 7.) A couple of days later, he was examined by Nurse Julie, who told him the spot appeared to be a callus but that she was not sure. (*Id.*) Nurse Julie told Plaintiff that she would schedule an appointment for him to see the Nurse Practitioner as soon as possible, because he was a diabetic. (*Id.*) On May 4, 2017, Plaintiff was examined by Nurse Practitioner Miller, who confirmed the diagnosis of a callus and ordered treatments including soaking the foot, applying Vaseline to the callus once per day, and wrapping the foot in a bandage. (*Id.*) The nurses carried out these

4

treatments until they ran out of Vaseline a few days later, and Nurse Ed "put some kind of white medication on [his] callus." (*Id.*)

A few days later, Plaintiff noticed that his foot was "swelling and getting red and the callus was getting splits in it." (*Id.*) The nurses could not explain these symptoms, and when he continued for several days to complain of increasing swelling and pain, "[a]ll they would say was: 'Mr. Stanton, you are on the list to see the Nurse Practitioner.'" (*Id.*) Plaintiff complained that he needed medication for the pain and infection in his foot, but the nurses told him they could not give him any medication unless it was ordered by the Nurse Practitioner. (*Id.*) Plaintiff repeatedly told the nurses that he was a diabetic and feared that he would lose his foot if it were not treated properly, and he began to fill out sick call forms. (*Id.*)

After "weeks went by," Plaintiff began to notice "a very foul odor" coming from his foot. (*Id.*) When he saw Nurse Landon at diabetic call, Nurse Landon concurred that the odor from his foot was bad and said that he would put Plaintiff's name on the list to see the Nurse Practitioner. (*Id.* at 7–8.) Plaintiff describes his difficulty in getting in to see the Nurse Practitioner as follows:

> I finally received an appointment with the Nurse Practitioner on the same day that I was scheduled for court. I told my pod officer that I cannot go to court because I needed to see the Nurse Practitioner because of the pain, infection, and swelling in my foot. She then called Lt. Slusher and he came and talked with me and I told him that my attorney had rescheduled my court date. He said, "you are on the court docket and you have to go to court." I took off my bandage to show him my foot and he saw the severity of it and said, "I promise you'll see the Nurse Practitioner as soon as you return." When I returned from court, I never saw the Nurse Practitioner. Nurse Sheree was doing diabetic shots and heard me talking to Lt. Slusher. She said, "Mr. Stanton, it is very important that you see the Nurse Practitioner." I told her you heard Lt. Slusher say that I would see the Nurse Practitioner after court, but I didn't see one. I constantly told Lt. Slusher that my health and the severity of my foot was important and that I needed to see the Nurse Practitioner. I asked the pod officer to call medical to see if I could see the Nurse Practitioner after I arrived from court, and it was confirmed that the Nurse Practitioner had already left for the day. Days continued and I constantly complained to all the nurses at treatment time, diabetic calls, and pill call that my foot was hurting me so bad that I could hardly sleep. My foot continued to get so

5

> bad I could hardly walk or put any weight on it because of the infection, redness, and swollenness.

(*Id.* at 8.) Plaintiff alleges that his nurses continued to say that he was "on the list to see the Nurse Practitioner," and that "they could not do anything except the treatments that the Nurse Practitioner ordered." (*Id.*)

After seeing a different nurse from another facility, who was critical of the nurses at Plaintiff's facility and said that she would "say something" about his foot, Plaintiff was examined by Dr. Wilkins on May 23, 2017. (*Id.*) Dr. Wilkins prescribed medication for the pain and infection and ordered a pair of crutches and new shoes, because of blood stains and the foul odor from Plaintiff's old shoes. (*Id.*) On June 5, 2017, Plaintiff was seen by Nurse Practitioner Weber, to whom he reported that the pain had "gotten a little better" with the medications, but that the swelling and infection were still there. (*Id.*) Nurse Practitioner Weber told Plaintiff that the infection would take a while to clear up and began to remove some dead skin from Plaintiff's foot, but he could not stand the pain. (*Id.*) Plaintiff asked Nurse Practitioner Weber why he could not be sent to the hospital for the dead skin and infection removal, "and she said that they [CCS] needed to get the infection cleared before they could do anything." (*Id.* at 8–9.) Nurse Practitioner Weber told Plaintiff that she would see him the next week to attempt to remove the rest of the dead skin, but weeks went by without Plaintiff seeing a Nurse Practitioner or Doctor. He continued to fill out sick call requests and complaints, but the response was always that he was "on the list" to see the Nurse Practitioner. (*Id.* at 9.)

Plaintiff was subsequently told by a nurse at diabetic call that he should have been seen by the Nurse Practitioner a week after June 5, 2017, and she took pictures of his foot and emailed them to the doctor. (*Id.*) Plaintiff filed a grievance over the delay, which was sustained with the admission that Plaintiff should have been seen in "follow-up within 2 weeks regarding [his] foot

6

ulcer," but was not seen until July 4, 2017. (*Id.* at 16.) On July 4, 2017, Plaintiff was seen by Nurse Shodge and Nurse Practitioner Thompson. (*Id.* at 9.) He asked to be sent to an outside hospital or specialist because he was concerned that he would lose his foot, but Nurse Practitioner Thompson told him he "would have to wait until the swelling and infection went away." (*Id.*) Nurse Practitioner Thompson told Plaintiff that she would put him on more medication for the infection and pain, and that he would be seen again the following week by a nurse practitioner, but it was not until July 13, 2017, after filing a grievance, that he was seen by Nurse Practitioner Weber. (*Id.*) Nurse Practitioner Weber noted that Plaintiff's foot was not improving, opined that something else had to be wrong with it, and attempted to remove more dead skin from the wound. (*Id.*) Plaintiff could not tolerate the pain of this procedure and asked to be transported to a hospital, but was again told that they had to get the infection out before they could send him to the hospital. (*Id.*)

On July 28, 2017, after filing another grievance against the medical department because he did not receive his insulin and foot treatment, Plaintiff was examined by an unnamed female doctor, who told him that "we cannot do the treatments you need done here, so I am going to send you to the outside Doctor so we can take care of your foot." (*Id.*) On August 2, 2017, Plaintiff was sent to Nashville Medical Foot Care, where a doctor performed a painful procedure that eventually alleviated much of the pain in Plaintiff's foot. (*Id.* at 9–10.) The doctor told Plaintiff that the longstanding infection had not been properly treated, and could present long-term issues due to Plaintiff's diabetes. (*Id.* at 10.) The doctor wanted to perform x-rays due to his concern that the infection could have spread to the bone, and said he wanted to see Plaintiff in a few weeks. (*Id.*)

Soon after this visit, the Tennessee Department of Correction (TDOC) took custody of Plaintiff. (*Id.*) Since being in TDOC custody, Plaintiff has been sent to Lois Deberry Special Needs Facility and to outside providers for treatment. (*Id.*) TDOC has approved him for surgery on his foot and other treatment due to his condition following the improper care he received at DCSO. (*Id.*) Plaintiff alleges that the damage done to his foot by this improper care, including Defendants' "continu[ing] to give the plaintiff the same inadequate treatments" and "forcing the plaintiff to go without [antibiotic] medications over a substantial period of time," limits his ability to walk without "suffering, pain, and humiliation." (*Id.* at 6.)

Plaintiff seeks monetary damages against CCS, Lt. Slusher and Lt. Shodge of the DCSO, and the following providers staffed by CCS: Dr. Wilkins, Nurse Practitioner Miller, Nurse Practitioner Weber, Nurse Practitioner Thompson, and Nurses Shodge, Stacy, Julie, Sabrina, and Landon. (*Id.* at 1–2; Doc. No. 4 at 1.) He sues all individual defendants in both their official and individual capacities, for violations of his rights under the Tennessee and U.S. Constitutions. Plaintiff seeks declaratory and injunctive relief against all Defendants, in addition to damages.

**E.   Analysis**

Plaintiff claims that he was denied appropriate medical care in violation of his rights under the Eighth and Fourteenth Amendments to the U.S. Constitution. (Doc. No. 1 at 6.) If Plaintiff was a pretrial detainee at the time of the actions complained of, he was protected by the Fourteenth Amendment's Due Process Clause from conduct that the Eighth Amendment would prohibit as against "individuals who have been tried, convicted, and sentenced." *Richko v. Wayne Cty., Mich.*, 819 F.3d 907, 915 (6th Cir. 2016). The Sixth Circuit "has made clear that, under the Fourteenth Amendment, pretrial detainees are 'entitled to the same Eighth Amendment rights as other inmates.'" *Id.* (quoting *Thompson v. County of Medina, Ohio*, 29 F.3d 238, 242 (6th Cir. 1994)).

"Eighth Amendment jurisprudence clearly establishes that deliberate indifference to serious medical needs of prisoners constitutes the unnecessary and wanton infliction of pain that is violative of the Constitution." *Darrah v. Krisher*, 865 F.3d 361, 367 (6th Cir. 2017) (quoting *Estelle*, 429 U.S. at 104, 105) (internal quotation marks omitted). "For this reason, deliberate indifference to a prisoner's serious illness or injury states a cause of action under § 1983," *id.*, whether the prisoner is a convict proceeding under the Eighth Amendment or a detainee proceeding under the Fourteenth Amendment.

In order to succeed in bringing a deliberate indifference claim in the medical context, Plaintiff must allege the deprivation of a "sufficiently serious" medical need by a Defendant who acted with a "sufficiently culpable state of mind." *Id.* at 367–68 (citing *Farmer v. Brennan*, 511 U.S. 825, 834 (1994)). A "serious medical need" is "one that has been diagnosed by a physician as mandating treatment or one that is so obvious that even a lay person would easily recognize the necessity for a doctor's attention." *Villegas v. Metro. Gov't of Nashville*, 709 F.3d 563, 570 (6th Cir. 2013). The state of mind described by "deliberate indifference" is demonstrated not by mere medical negligence, but only when an official knows of and disregards an excessive risk to the inmate's health or safety. *Farmer*, 511 U.S. at 836–37.

Plaintiff presents a sufficiently serious medical need by alleging an infected, ulcerated lesion on his foot which, in combination with his diabetes, limited his ability to walk due to the associated pain, swelling, and necrotic tissue. Deliberate indifference is a somewhat closer question. Plaintiff apparently received some medical attention on a daily or near-daily basis from the various nurses at the DCSO due to his diabetes and his foot condition, though he alleges that the nurses who continued providing the foot soaks, Vaseline, and wraps knew of his diabetes and —within days of beginning those treatments—his need for antibiotic medication. His allegations

9

concerning (1) the continuation of those treatments despite knowledge of their ineffectiveness; (2) the delay in medical attention from a doctor or nurse practitioner after signs of infection began to appear in his foot; (3) the delay in timely follow-up care with a doctor or nurse practitioner; and (4) the refusal to send Plaintiff for medical attention outside of the facility until the infection had resolved, are offered to show deliberate indifference to the severity of his pain and the seriousness of his infection, particularly as his providers knew that the prolonged infection in his foot was more significant due to his diabetes.

The complaint alleges that from May 4, 2017, when Plaintiff was first examined by a Nurse Practitioner and diagnosed with a callus, until May 23, when he was examined by Dr. Wilkins, Plaintiff's foot was regularly treated by nurses with a foot soak, Vaseline, and a bandage wrap pursuant to the Nurse Practitioner's orders, despite the intervening appearance of signs of infection and increasing pain. From May 23 until August 2, 2017, the pain and infection were treated, largely unsuccessfully, with medications while Plaintiff displayed dead skin around the ulceration and a foul odor from it, and blood in his shoe. On July 13, 2017, Nurse Practitioner Weber noted that Plaintiff's foot was not improving and opined that something else had to be wrong with it, but again told Plaintiff that he could not be moved for treatment at an outside facility until the infection was under control. On August 2, 2017, despite the continued lack of infection control, Plaintiff was sent to an outside specialist who expressed concern that the poorly managed infection would present long-term issues due to Plaintiff's diabetes, though the specialist was able to perform a procedure that gave Plaintiff significant relief from his pain. During the time of his treatment for this problem at DCSO, Plaintiff was known by his providers to be a diabetic, received insulin and was otherwise followed by them for his diabetes, and "constantly complained to all the nurses at

treatment time, diabetic calls, and pill call that my foot was hurting me so bad that I could hardly sleep[,] . . . walk[,] or put any weight on it." (Doc. No. 1 at 8.)

"Where a prisoner has received some medical attention and the dispute is over the adequacy of the treatment, federal courts are generally reluctant to second guess medical judgments and to constitutionalize claims which sound in state tort law." *Westlake v. Lucas*, 537 F.2d 857, 860 n.5 (6th Cir. 1976). However, "[w]hen the need for medical treatment is obvious, medical care which is so cursory as to amount to no treatment at all may amount to deliberate indifference." *Terrance v. Northville Reg'l Psychiatric Hosp.*, 286 F.3d 834, 843 (6th Cir. 2002) (quoting *Mandel v. Doe*, 888 F.2d 783, 789 (11th Cir. 1989)). Such a claim is supported by Plaintiff's allegations that (1) although he showed obvious signs of infection upon examination by nurses at diabetic call or during his daily foot care, he was not treated for that infection, but continued to receive treatment for a callus for a period of days or weeks, and (2) after beginning treatment for the infection and maintaining that treatment for nearly two months, he was noted to show no improvement yet was still not sent for specialized treatment for two additional weeks, when a doctor conceded that "we cannot do the treatments you need done here." In *Darrah v. Krisher*, the Sixth Circuit held that "the question of whether it was reasonable to continue to keep [the inmate] on a drug that had proven ineffective and whether that course of treatment constituted deliberate indifference is a question best suited for a jury." 865 F.3d 361, 370 (6th Cir. 2017). Even a two-week period of failing to provide effective treatment may be sufficient to support a deliberate indifference claim, if the ineffectiveness of the treatment and the seriousness of the inmate's medical need are known. *See id.* at 371.

Viewing the complaint in the light most favorable to Plaintiff and taking as true its well-plead factual allegations, as the Court must at this initial stage, the Court finds that it states a

11

colorable claim for denial of needed medical attention that, in light of Plaintiff's diabetes, presented an excessive risk to his health which Defendants knew of and disregarded. The complaint alleges this deliberate indifference against "the nurses" who knew of Plaintiff's diabetes and signs of infection but continued to provide ineffective foot treatments (Doc. No. 1 at 7–8), which the Court liberally construes to encompass each of the named Defendant nurses (Shodge, Stacy, Julie, Sabrina, and Landon); and, against Nurse Practitioners Weber and Thompson, who recognized the severity of the condition but declined to order or recommend evaluation by an outside medical provider. This Eighth Amendment claim will be allowed to go forward against these individual Defendants for further development of the record. *Cf. Bovin Belskis v. DT Developers, Inc.*, No. 1:15-cv-00091-JAW, 2016 WL 5395833, at *13 (D. Me. Sept. 27, 2016) (declining to dismiss 8th Amendment claim against nurses at pleading stage, despite lack of specificity in allegations against individual nurses; finding it reasonable to infer that each nurse was deliberately indifferent based on allegation of delay in diabetic inmate's wound care during which the nurses continued to treat foot wound with dressing changes and saline cleaning "even when Mr. Belskis presented a foot that was swollen and extremely firm and hot").

Moreover, the allegations of the complaint are sufficient to state a claim that the delay in sending Plaintiff to a hospital or specialist was pursuant to a CCS policy against transporting prisoners outside of the facility until their infection is controlled or eliminated. *See Starcher v. Corr. Med. Sys., Inc.*, 7 F. App'x 459, 465 (6th Cir. 2001) (finding medical services contractor subject to liability under § 1983 only if deprivation of rights caused by corporate policy) (citing *Street v. Corr. Corp. of Am.*, 102 F.3d 810, 818 (6th Cir. 1996)). Accordingly, the Court finds a colorable claim stated against CCS.

However, Nurse Practitioner Miller is only alleged to have misdiagnosed the foot condition in its early stages and prescribed the treatment which was later revealed to be ineffective due to the development of an infection and ulceration. (Doc. No. 1 at 7.) Dr. Wilkins is alleged to have initially diagnosed the infection and prescribed medication, crutches, and new shoes. (*Id.* at 8.) The claims against these two individuals do not rise above the level of medical negligence, and therefore must be **DISMISSED**. *Farmer*, 511 U.S. at 836–37.

Moreover, while the caption of the complaint lists Lt. Shodge as a Defendant, Lt. Shodge is not mentioned elsewhere in the complaint, and is not implicated in any violation of Plaintiff's constitutional rights. Accordingly, Lt. Shodge is **DISMISSED** from this action, without prejudice to Plaintiff's ability to amend his complaint to allege facts that would state a claim against Lt. Shodge. As to Lt. Slusher, who allegedly refused to allow Plaintiff to keep his appointment with a Nurse Practitioner due to a scheduled court appearance, but promised to ensure that he saw the Nurse Practitioner when he returned from court and then reneged on that promise, no plausible claim is stated. According to the complaint, Lt. Slusher was advised of Plaintiff's foot condition on the same day that he was charged with delivering Plaintiff to court, and is not thereafter alleged to have been involved with or apprised of Plaintiff's medical care, or the lack thereof. Lt. Slusher's failure to ensure that Plaintiff immediately saw the nurse practitioner upon his return from court, when Plaintiff was otherwise regularly engaged with the jail medical personnel, cannot support the claim of deliberate indifference. Accordingly, Lt. Slusher is **DISMISSED** from this action.

Finally, the Court finds that Plaintiff is not entitled to the injunctive relief he seeks, as he concedes that he is no longer subject to Defendants' alleged unconstitutional policies and practices after being transferred from the DCSO to the custody of the TDOC, where his medical needs are

being addressed. (Doc. No. 1 at 10.) His request for injunctive relief is therefore **DENIED as MOOT**.

## III. Conclusion

As explained above, the Court finds that the complaint states a colorable Section 1983 claim of deliberate indifference to Plaintiff's serious medical needs. This claim survives the required PLRA screening and shall proceed for further development of the record.

Consequently, the Clerk is instructed to send Plaintiff a service packet (blank summons and USM 285 form) for Nurses Shodge, Stacy, Julie, Sabrina, and Landon; Nurse Practitioners Weber and Thompson; and Correct Care Solutions. Plaintiff will complete the service packets and return them to the Clerk's Office within twenty (20) days of the date of receipt of this Order.

Upon return of the service packets, **PROCESS SHALL ISSUE** to the Defendants. Plaintiff is forewarned that the failure to return the completed service packets within the time required could jeopardize his prosecution of this action.

Pursuant to 28 U.S.C. §§ 636(b)(1)(A) and (B), this action is **REFERRED** to the Magistrate Judge to enter a scheduling order for the management of the case, to dispose or recommend disposition of any pre-trial, non-dispositive motions, to issue a Report and Recommendation on all dispositive motions, and to conduct further proceedings, if necessary, under Rule 72(b), Fed. R. Civ. P., and the Local Rules of Court.

It is so **ORDERED**.

_____
WILLIAM L. CAMPBELL, JR.
UNITED STATES DISTRICT JUDGE